<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **MICHELLE L. GONZALEZ,** | |
| *Plaintiff*, | **Civil Action No. 14-07397** |
| **v.** | **OPINION** |
| **CAROLYN W. COLVIN, Acting Commissioner of Social Security,** | |
| *Defendant.* | |

**ARLEO, UNITED STATES DISTRICT JUDGE**

Before this Court is Plaintiff Michelle L. Gonzalez's ("Plaintiff") request for review, pursuant to 42 U.S.C. §§ 1383(c)(3), 405(g), of the Commissioner of Social Security Administration's ("Commissioner") denial of supplemental security income benefits ("disability benefits") to Plaintiff. Plaintiff argues that the Commissioner's decision is not supported by substantial evidence because the opinion: (1) fails to compare the combined effect of all Plaintiff's impairments to the relevant Medical Listings ("Listings") in the step three analysis, and (2) does not rely on substantial evidence in support of the residual functional capacity ("RFC") assessment under step four. For the reasons set forth in this Opinion, the Court finds that the Commissioner's decision must be **AFFIRMED**.

I.      **STANDARD OF REVIEW AND APPLICABLE LAW**

       **A.  Standard of Review**

       This Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. § 405(g). This Court must affirm the Commissioner's decision if substantial evidence supports

the decision.   42 U.S.C. § 405(g); <u>Markle v. Barnhart</u>, 324 F.3d 182, 187 (3d Cir. 2003).

Substantial evidence, in turn, "means such relevant evidence as a reasonable mind might accept as

adequate."  <u>Ventura v. Shalala</u>, 55 F.3d 900, 901 (3d Cir. 1995).  Stated differently, substantial

evidence consists of "more than a mere scintilla of evidence but may be less than a preponderance."

<u>Newell v. Comm'r of Soc. Sec.</u>, 347 F.3d 541, 545 (3d Cir. 2003).

"[T]he substantial evidence standard is a deferential standard of review."  <u>Jones v.

Barnhart</u>, 364 F.3d 501, 503 (3d Cir. 2004).  Accordingly, the standard places a significant limit

on the district court's scope of review.  The reviewing court should not "weigh the evidence or

substitute its conclusions for those of the fact-finder."  <u>Williams v. Sullivan</u>, 970 F.2d 1178, 1182

(3d Cir. 1992).  Therefore, even if this Court would have decided the matter differently, it is bound

by the Commissioner's findings of fact so long as they are supported by substantial evidence.

<u>Hagans v. Comm'r of Soc. Sec.</u>, 694 F.3d 287, 292 (3d Cir. 2012).

In determining whether there is substantial evidence to support the Commissioner's

decision, the Court must consider: "(1) the objective medical facts; (2) the diagnoses of expert

opinions of treating and examining physicians on subsidiary questions of fact; (3) subjective

evidence of pain testified to by the claimant and corroborated by family and neighbors; and (4) the

claimant's educational background, work history, and present age."  <u>Blalock v. Richardson</u>, 483

F.2d 773, 776 (4th Cir. 1972).

**B.  Five-Step Sequential Analysis of Adult Disability**

In order to determine whether an adult claimant is disabled, the Commissioner must apply

a five-step test.  20 C.F.R. § 404.1520(a)(4).  First, it must be determined whether the claimant is

currently engaging in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  "Substantial

gainful activity" is defined as work activity, both physical and mental, that is typically performed

2

for either profit or pay.  20 C.F.R. § 404.1572.  If it is found that the claimant is engaged in substantial gainful activity, then he or she is not disabled and the inquiry ends.  Jones, 364 F.3d at 503.  If it is determined that the claimant is not engaged in substantial gainful activity, the analysis moves on to the second step: whether the claimed impairment or combination of impairments is "severe."  20 C.F.R. § 404.1520(a)(4)(ii).  An impairment or combination of impairments is severe only when it places a significant limit on the claimant's "physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimed impairment or combination of impairments is not severe, the inquiry ends and benefits must be denied.  Id.; Ortega v. Comm'r of Soc. Sec., 232 F. App'x 194, 196 (3d Cir. 2007).

At the third step, the Commissioner must determine whether there is sufficient evidence showing that the claimant suffers from a listed impairment.  20 C.F.R. § 404.1520(a)(4)(iii).  If so, a disability is conclusively established and the claimant is entitled to benefits.  Jones, 364 F.3d at 503.  If not, the Commissioner, at step four, must ask whether the claimant has "residual functional capacity" such that he is capable of performing past relevant work; if that question is answered in the affirmative, the claim for benefits must be denied.  Id.  Finally, if the claimant is unable to engage in past relevant work, the Commissioner must ask, at step five, "whether work exists in significant numbers in the national economy" that the claimant is capable of performing in light of "his medical impairments, age, education, past work experience, and 'residual functional capacity.'"  20 C.F.R. §§ 404.1520(a)(4)(iii)-(v); Jones, 364 F.3d at 503.  The claimant bears the burden of establishing steps one through four, while the burden of proof shifts to the Commissioner at step five.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

3

## II.    DISCUSSION

### A.  Procedural History

Plaintiff filed an application for supplemental security income on January 11, 2011.  Tr. 163-168.  The application was denied initially on July 26, 2011, and on reconsideration on February 2, 2012.  Tr. 99-102, 106-107.  Plaintiff then sought review before an administrative law judge, and a hearing before the Honorable Elias Feuer (the "ALJ") occurred on March 26, 2013.  Tr. 31-69.  Following that hearing, the ALJ issued an opinion on May 8, 2013, finding that Plaintiff was not disabled under the standards for adult disability.  Tr. 12-30.  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on September 25, 2014.  Tr. 1-6.  Having exhausted her administrative remedies, Plaintiff then timely filed the instant action on November 26, 2014.  Dkt. No. 1, Compl.

### B.  Factual Background

Plaintiff is a forty-eight year old woman who alleged disability due to bipolar disorder, depression, and asthma.  Tr. 197.  In October 2009, Plaintiff went to the emergency room with multiple complaints, including chest pain, kidney pain, back pain, headaches, and right upper quadrant pain.  Tr. 285, 288.  Plaintiff noted that she had not taken her medication for the past two years.  Tr. 285-86.  The attending physician observed that Plaintiff had a steady gait; she moved all extremities without difficulty; she had no muscle wasting, swelling, tenderness, or deformity; and she had intact range of motion.  Tr. 286.  The emergency room physician prescribed Toradol intravenously and oral pain medications.  Tr. 289.  Plaintiff stated the medications resolved all of her complaints and was discharged in good condition.  Tr. 289, 292.

In December 2009, Plaintiff began treatment at Trinitas Hospital's Department of Behavioral Health.  Tr. 413-23.  During the intake assessment, Plaintiff told the clinician she had

been diagnosed with bipolar disorder in the past, and currently suffered from symptoms of depression including social isolation, fatigue, decreased appetite, low self-esteem, mood swings, and irritability.  Tr. 413.  Plaintiff also reported relationship problems with both her ex-husband and current boyfriend.  Id.  On mental status examination, Plaintiff had a depressed mood and a congruent affect; she had normal speech and intact thought processes; she said she heard people trying to come in her door at night, but she had no delusions; her remote memory was impaired, but not her immediate and recent memory; she had intact general knowledge; and she had fair insight, orientation, and cognitive function, but limited judgment.  Tr. 421-22.  The clinician diagnosed bipolar disorder by history, ruled out post-traumatic stress disorder, and assigned a current Global Assessment of Functioning (GAF) score of 58.  Tr. 423.  The clinician scheduled Plaintiff for a subsequent psychiatric evaluation.  Id.

On January 14, 2010, Steven Grelecki, M.D., performed a psychiatric evaluation.  Tr. 427-31.  Dr. Grelecki's mental status examination showed Plaintiff was agitated, but superficially cooperative; had goal-directed and organized speech; had an anxious mood with a full affect that was congruent to her mood; denied any current suicidal ideation; demonstrated no formal thought process or content disorder; was alert and oriented times three; had an intact fund of knowledge; had somewhat compromised judgment; but had significant insight into her circumstances.  Tr. 430.  Dr. Grelecki diagnosed a mood disorder not otherwise specified (NOS) and assigned a GAF score of 50-55.  Tr. 430-31.  Dr. Grelecki provided Plaintiff with Abilify samples and asked her to return in two weeks.  Tr. 431.

Plaintiff went to family practitioner Marie Brice, M.D., in June 2010 as a new patient for evaluation of asthma and neck, right shoulder, right arm, and low back pain.  Tr. 357-59.  Dr. Brice's physical examination revealed clear lungs and full, painless range of motion without spasm

or tenderness, except for some restriction on range of motion in Plaintiff's right shoulder, low back, and cervical spine.  Tr. 358-59.  The neurological examination revealed normal sensation, power, deep tendon reflexes, and coordination.  Tr. 358-69.  Dr. Brice prescribed Albuterol and Advair for asthma symptoms, and ibuprofen for pain.  Tr. 359, 375.  She also wrote Plaintiff a work excuse for the month of March 2010 "due to uncontrolled asthma attacks."  Tr. 377.

On October 2, 2010, Plaintiff went to the emergency room complaining of shortness of breath not relieved by her inhaler and low back pain radiating into her hip.  Tr. 296-97.  The attending physician's examination detected diffuse wheezing but normal, unlabored respiratory effort.  Tr. 299-300.  In addition, Plaintiff reported some muscle tenderness but she had a normal stature, posture, joints, and gait, she moved all extremities symmetrically and purposefully, and her sensation was intact.  Tr. 300.  Plaintiff stopped wheezing after a second nebulizer treatment. Id.  The attending physician discussed the importance of not smoking.  Id.  Upon discharge, Plaintiff received a small supply of Naprosyn, Prednisone, and Valium.  Tr. 302.

Plaintiff continued to see Dr. Brice every two months.  During an October 2010 appointment, Plaintiff reported continued right shoulder and back pain.  Tr. 360.  Her breathing was doing well, but she needed medication refills.  Id.  Dr. Brice ordered cervical spine x-rays that showed normal lordosis with chronic, severe degenerative disc disease at C5-C7 without fracture or mal-alignment; lumbar spine x-rays that showed a straightened lordosis without fracture, mal-alignment, or disc thinning; and right shoulder x-rays that showed mild arthritis.  Tr. 345, 369-71, 374.  Chest x-rays were negative.  Tr. 368.  Dr. Brice prescribed medications and asked Plaintiff to continue with psychiatry.  Tr. 361.

Plaintiff saw Dr. Grelecki in September, October, and November 2010 for medication checks and adjustments.  Tr. 438, 440.  Although Plaintiff reported feeling overwhelmed taking

6

care of her mother during the November appointment, she felt better with medications and denied any side effects.  Tr. 438.

Plaintiff followed up with Dr. Brice in December 2010 and reported that ibuprofen did not relieve her pain.  Tr. 362.  Plaintiff had restricted low back area range of motion, but no spasm or tenderness; a negative straight-leg raising test; and intact power, sensation, and coordination.  Tr. 363.  Dr. Brice refilled Plaintiff's medications, added Percocet for pain, and considered referring Plaintiff to a physiatrist for chronic pain management.  Id.

In February 2011, Plaintiff returned to Dr. Brice for a routine appointment.  Tr. 364-65.  Plaintiff had restricted low back area range of motion, but a negative straight-leg raising test and intact motor power and sensation.  Id.  Dr. Brice ordered a lumbar spine MRI that showed mild degenerative changes, greatest at L4-5, and prescribed medications.  Tr. 320-21, 365, 378.  During a routine appointment in April 2011, Plaintiff continued to report low back pain and needed asthma medication refills.  Tr. 366.  Her mood had been good, and she was doing well overall.  Id.  Dr. Brice's examination elicited low back pain on flexion, but the straight-leg raising test was negative, Plaintiff's motor strength was 5/5, and her sensation was intact.  Tr. 367.  She refilled Plaintiff's medications and recommended that Plaintiff follow up with an orthopedist.  Id.

Plaintiff also saw Dr. Grelecki in February 2011 for a medication check.  Tr. 439.  Although she felt the medication was not helping "that much," she was less irritable, she felt better, and her motivation, attention, concentration, and sleep had improved.  Id.  Plaintiff also reported being happy taking care of her grandson.  Id.  Dr. Grelecki asked Plaintiff to continue taking Elavil and to increase her Effexor dose.  Id.  During a May 2011 medication check, Plaintiff stated, "I am better."  Tr. 441.  Dr. Grelecki noted that Plaintiff had a regular speech rate and rhythm, fair eye contact, and she was alert and oriented to time, place, and person.  Id.  He asked Plaintiff to

7

continue taking Elavil and Effexor.  Id.  During a June 2011 appointment, Dr. Grelecki had Plaintiff discontinue Elavil and start Seroquel.  Tr. 406.

Plaintiff followed up with Dr. Brice in June 2011 reporting a head injury when a shelf fell on her head.  Tr. 382.  She still reported neck pain radiating into her arm and low back pain.  Id.  Dr. Brice's physical examination revealed restricted low back flexion, but no spasm or muscle tenderness; a negative straight-leg raising test; normal motor strength; intact sensation; and full cervical spine range of motion.  Tr. 383.  Dr. Brice recommended a heating pad over the affected area and prescribed a one-month supply of Percocet for pain as needed.  Id.

Ernesto Perdomo, Ph.D., performed a consultative psychological evaluation in July 2011 to assess Plaintiff's claims of bipolar disorder and depression.  Tr. 391-94.  Plaintiff told Dr. Perdomo that she heard voices calling her to go with them, stating that it was "better where they are;" heard people talking outside of her home, but no one was there; was always sad, cried a lot, and felt very tired; had no desire, interest, or motivation; slept a lot and only wanted to be in bed; had no energy; did not want to see or talk to anyone; did not want to leave her house; thought people were following, spying, and watching her; was very irritable and snapped at people; and only wanted to be alone.  Tr. 391.  Plaintiff reported a history of difficulty holding a job because she did not get along with people.  Id.  Although Plaintiff had no history of psychiatric hospitalizations, she said she was receiving outpatient treatment at Trinitas Hospital once per month for medication checks.  Tr. 392.  Plaintiff's daily activities included lying in bed and watching television; doing some household chores; shopping for food with her daughter, although she rarely left home; and taking care of her personal needs and hygiene.  Id.  Plaintiff said she could understand and follow instructions.  Id.

On mental status examination, Plaintiff was casually dressed and groomed; oriented to person, place, and time; had a normal gait; had a well-organized and focused thought process; and spoke coherently and relevantly; had a depressed mood and affect; spoke in monotone; had fair short-term memory and good long-term memory; had fair concentration; had borderline to very low average intelligence; and had adequate vocabulary.  Tr. 393.  Dr. Perdomo diagnosed bipolar disorder and possible schizoaffective disorder, and assigned a GAF score of 50, indicating significant symptoms.  Tr. 393-94.

During an August 2011 appointment with Dr. Brice, Plaintiff denied wheezing, coughing, or other associated symptoms, but noted she had been using her asthma medications more than usual due to chest tightness.  Tr. 384.  Plaintiff also reported continued back pain, but noted she was undergoing physical therapy.  Id.  Dr. Brice refilled all of Plaintiff's medications and recommended that Plaintiff continue physical therapy.  Tr. 385.

Plaintiff returned to Dr. Grelecki in September 2011 for a medication check. She denied suicidal or homicidal ideations and reported better control of her anger.  Tr. 442.  Dr. Grelecki asked Plaintiff to continue taking Effexor and increase her Seroquel dose.  Plaintiff did not keep her October 2011 appointment.  Id.  When she returned to Dr. Grelecki's office in December 2012, Plaintiff had no physical complaints and a fair appetite and ability to sleep.  Tr. 490.  Plaintiff's thoughts were organized, her speech was regular, and she described her mood as euthymic.  Id.  Although she admitted to hearing her deceased father and brother's voices on occasion, the last time was three weeks earlier and she was not afraid of them because "it is just mumbling" and she knew they were not trying to harm her.  Id.

Rambhai Patel, M.D., performed a consultative examination in December 2011.  Tr. 443-44.  Dr. Patel's physical examination showed that Plaintiff walked with a normal gait and without

any assistive device; she had no lower extremity swelling; her reflexes and sensation were normal; she had no neurological deficits; and she could squat, walk on her heels, and walk on her toes.  Tr. 443-44, 449.  Chest x-rays were normal, but pulmonary function tests suggested obstructive lung disease.  Tr. 444, 447.  Dr. Patel's impression was bipolar disorder by history, chronic asthma, and refraction error.  Tr. 444.  Dr. Patel noted that Plaintiff was not experiencing any asthma attacks, and could do fine and gross movements with both hands, had a normal grip, could walk without an assistive device, and had no gross sensory or motor deficit.  Id.

In January 2012, Ronald Silikovitz, Ph.D., performed a consultative psychological evaluation at the state agency's request.  Tr. 452-56.  Plaintiff told Dr. Silikovitz that she heard voices "every day" for almost a year, voices that told her to "come with them."  Tr. 454.  She also reported hearing her father and brother, and felt that people were out to get her.  Id.  During the interview, Plaintiff was generally able to maintain eye contact and concentration, but she appeared uncomfortable.  Tr. 455.

Plaintiff told Dr. Silikovitz that her daughter did all of her household chores, and came to her house to make sure she took her medications and had something to eat.  Id.  She denied having manic phases, prompting Dr. Silikovitz to note that she is "not likely to be bipolar."  Id.  Plaintiff reported having a few friends, and that her children and grandchildren visited her.  Tr. 455.  She left her home to go to the store with her daughter or to go to her daughter's home, but said she did not engage in any recreational activities.  Id.  Dr. Silikovitz diagnosed severe depression with psychotic behavior, assigned a GAF score of 32, and indicated that Plaintiff's prognosis was poor.  Tr. 455-56.  He noted that, "Claimant reports she is unable to work due to her chronic emotional and reported physical conditions."  Tr. 456.

During a February 2012 medication check with Dr. Grelecki's partner, Saul Gorman, M.D., Plaintiff reported poor sleep, a poor appetite, and being more isolative. Tr. 490. Dr. Gorman noted that Plaintiff brought in "disability forms to be filled again because law firm had seen prior papers I had filled out and found [her] to have minimal limitations." Id. Dr. Gorman increased Plaintiff's Seroquel dose. Id. During a March 2012 appointment, Plaintiff had increased energy and motivation, and a euthymic mood with a congruent affect. Tr. 491. She had been taking care of her grandchildren, which was brightening her mood. Dr. Gorman recommended Plaintiff continue her same medications. Id. In April 2012, Plaintiff told Dr. Gorman she was compliant with medications and had fair sleep and appetite. On mental status examination, Plaintiff had a euthymic mood with a congruent affect; organized thoughts; regular speech; and no suicidal or homicidal ideations. Dr. Gorman made no medication changes. Id.

During a July 2012 medication check, Plaintiff denied symptoms of depression, mania, or thoughts of wanting to hurt herself or others. Tr. 478. She was eating and sleeping without difficulty and tolerating her medication well. Plaintiff also reported helping with her grandchildren on a daily basis, and that she enjoyed being with them. Id. On mental status examination, Plaintiff's mood was neutral, and she had no perceptual disturbances such as audio or visual hallucinations. Tr. 479. Dr. Gorman made no medication adjustments. Tr. 480. When she returned in September 2012, Plaintiff said she had stopped taking Seroquel because she felt groggy, and felt Effexor was not helping. Tr. 475. She also reported attacking her son's friend after he "trashed" her house. Id. Dr. Gorman recommended a slow Effexor taper and that Plaintiff start Wellbutrin and Risperdal. Id.

When Plaintiff returned in October 2012, she said she stopped taking her new medication due to side effects, and she admitted to feelings of depression and increased episodes where she

heard her father's voice.  Tr. 472.  During a November 2012 follow-up appointment, Plaintiff reported that Prozac was working well; she was sleeping well and had less depression.  Tr. 469. During a December 2012 appointment, Plaintiff reported depression with less interest in engaging in activities during the day.  Tr. 466.  Dr. Gorman increased Plaintiff's Prozac dose.  Tr. 467.

In June 2011, state agency physician Jose Rabelo, M.D., reviewed the evidence of record and noted that Plaintiff's asthma had been under control; she had no spasms or tenderness to deep palpation of her low back; she had mild lumbar spine degenerative arthritis; and she had degenerative changes at C5-C7.  Tr. 390.  Overall, Dr. Rabelo concurred with state agency physician Seun Park, M.D.'s assessment that, despite her impairments, Plaintiff could perform light work that involved standing, walking, and sitting six hours in an eight-hour workday; frequent climbing of stairs and ramps, balancing, kneeling, crouching, and crawling; and occasional climbing of ladders, ropes, or scaffolds, and stooping.  Tr. 76-78, 390.

Robert Starace, Ph.D., also reviewed the evidence of record at the initial level of review. Tr. 78-80.  He noted that Plaintiff alleged perceptual abnormalities (i.e., hearing voices of deceased father and brother), but treatment notes did not substantiate ongoing psychotic content/processes. Tr. 79.  Dr. Starace further noted Plaintiff had never been hospitalized for a psychiatric condition, and treatment notes showed she had a well-organized, coherent, focused, and relevant thought process.  Id.  Dr. Starace concluded Plaintiff could understand, remember, and execute simple instructions and tasks, sustain concentration, persistence, and pace, interact adequately, and adapt to changes.  Tr. 79-80.

In a Function Report, Plaintiff described her typical day as getting up, making coffee, going for a walk, coming back and watching television, and cleaning up.  Tr. 214.  She indicated that she did not take care of anyone else, including grandchildren.  Tr. 215.  Plaintiff further indicated that

she had difficulty caring for her personal needs due to back pain and shortness of breath.  Id.  She prepared simple meals such as sandwiches and frozen dinners.  Tr. 216.  Plaintiff did her own laundry once a week, and cleaned her home twice a week.  Id.  She left her home every day and shopped for food a couple of times per month.  Tr. 217.  Plaintiff talked with others on the phone every day and regularly went "window" shopping.  Tr. 218.  She had no problems getting along with family, friends, or neighbors.  Tr. 219.  Although she did not handle changes and stress well, she could pay attention "most of the time," and could follow written and verbal instructions.  Tr. 219-20.  She also got along well with authority figures, but noted some paranoia.  Tr. 220.

Plaintiff's adult daughter also completed a Function Report on Plaintiff's behalf.  Tr. 239-46.  She noted that Plaintiff's day typically involved getting up, dressing, and watching television "if she has no [doctors] appointments or other plans."  Tr. 239.  Plaintiff's daughter indicated that she had to remind her mother to take her medications every day.  Tr. 241.  Plaintiff cooked simple meals for herself and did house work such as washing dishes, and laundering and ironing clothing.  Id.  Plaintiff's daughter indicated that Plaintiff got along well with authority figures, had never been fired for difficulty getting along with others, and handled stress "fine."  Tr. 245.

During the March 2013 hearing, the ALJ noted that Plaintiff brought a cane with her to the hearing.  Tr. 46.  When questioned, Plaintiff testified that she got the cane on her own about three months earlier—it was not prescribed—because she allegedly fell a couple of times.  Id.  Plaintiff testified that no doctor recommended surgery for her back, and that although she received pain medications at times for short periods, she did not receive any long-term pain management treatment.  Tr. 46-48.  Her daughters visited her with her grandchildren at times, but she testified she never babysat for them.  Tr. 61-62.

13

The ALJ asked the vocational expert to assume an individual limited to light exertional level work who could frequently climb ramps and stairs, balance, kneel, crouch, and crawl; occasionally climb ladders, ropes, and scaffolds; and follow simple instructions.  Tr. 64.  The vocational expert testified that such an individual could perform Plaintiff's past work as a hotel housekeeper.  Tr. 64.  The vocational expert testified that such an individual would be able to perform jobs in the local or national economy even if they would be off-task for five minutes of every hour, but not if they would be off-task for ten minutes of every hour.  The vocational expert also identified jobs at the sedentary level that Plaintiff could perform.  Tr. 64-65.

### C.  The ALJ's Decision

The ALJ found that plaintiff had not engaged in substantial gainful activity since January 12, 2011, the date she filed her SSI application.  Tr. 17.  The ALJ determined that Plaintiff had "severe" impairments consisting of back disorder, obesity, depression, and bipolar disorder.  Id. The ALJ concluded that Plaintiff's impairments did not meet or medically equal the criteria of any impairment in the Listings.  Tr. 17-18.  The ALJ subsequently found that Plaintiff retained the residual functional capacity to, in an eight hour workday: sit up to six hours; stand/walk up to six hours; lift/carry up to twenty pounds occasionally, and ten pounds frequently; perform work involving frequent balancing, kneeling, crouching, crawling, and climbing of ramps and stairs; and perform jobs involving only simple instructions.  Tr. 18-25.

The ALJ considered Plaintiff's subjective complaints in assessing her residual functional capacity, but found that her statements concerning the intensity, persistence, and limiting effects the alleged symptoms were not entirely credible.   Tr. 19, 24.  The ALJ found that Plaintiff is capable of performing past relevant work as a hotel housekeeper, which does not require the performance of work-related activities precluded by the Plaintiff's residual functional capacity.

Tr. 25.  In reaching this finding, the ALJ relied on the testimony of the vocational expert.  Tr. 25-26. Accordingly, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act, and denied her claim for SSI.  Tr. 26.

### D.  Analysis

Plaintiff alleges that the Commissioner's decision is not supported by substantial evidence because the opinion: (1) fails to compare the combined effect of all Plaintiff's impairments to the relevant Medical Listings ("Listings") in the step three analysis, and (2) fails to base the residual functional capacity ("RFC") assessment on substantial evidence.  These arguments do not prevail because the ALJ's decision appropriately assesses Plaintiff's impairments under applicable law and is supported by substantial evidence.

### 1.  Alleged Failure to Compare the Combined Effect of All Plaintiff's Impairments to Relevant Medical Listings Under the Step Three Analysis

Plaintiff contends that the ALJ erred by failing to meaningfully compare her impairments, both individually and in combination, to a listed impairment under the step three analysis.  The Court disagrees because the ALJ based his determination on substantial evidence, and the Plaintiff did not meet her burden of proving that her impairments meet or medically equal a Listing.  See Sullivan v. Zebley, 493 U.S. 521, 531 (1990); 20 C.F.R. § 404.1512.

The Listings bestow an irrefutable presumption of disability; consequently, "[f]or a claimant to show that her impairment matches a [listed impairment], it must meet all of the specified medical criteria."  Zebley, 493 U.S. at 530.  To establish medical equivalency, a claimant must present medical evidence that her impairment, unlisted impairment, or combination of impairments, is equal in severity and duration to all of the criteria of a listed impairment.  Id. at 520; see also 20 C.F.R. § 416.926.  In this case, the record does not reflect any discernable

attempt by Plaintiff to demonstrate she possesses all the specified medical criteria of a listed impairment to meet this stringent requirement.

a. <u>The ALJ's alleged failure to compare Plaintiff's impairments to Listing 1.04</u>

With respect to Plaintiff's back disorder and obesity, she appears to assert that the ALJ should have found these impairments medically equivalent to Listing 1.04 encompassing disorders of the spine; specifically, degenerative disc disease. Pl.'s Br. at 14-15. Such a Listing is met only when Plaintiff demonstrates to the ALJ that she possesses the underlying spinal disorder and it resulted in comprise of a nerve root or the spinal cord. In addition, the impairment must be accompanied by either evidence of nerve root compression with sensory or reflex loss, and positive straight-leg raising test; spinal arachnoiditis manifested by severe burning or painful dysesthesia, requiring changes in position or posture more than once every two hours; or lumbar spinal stenosis manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively. 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.04.

Nothing in the record shows an attempt by Plaintiff to explain how her physical impairments rise to the stringent requirements of Listing 1.04. The record contains many varying accounts of Plaintiff's condition, including: a neurological examination revealing normal sensation, power, deep tendon reflexes, and coordination, Tr. 358-69; some muscle tenderness but normal stature, posture, joints, and gait, Tr. 300; cervical spine x-rays that showed normal lordosis with chronic, severe degenerative disc disease at C5-C7 without fracture or mal-alignment, Tr. 345; and a negative straight-leg raising test, normal motor strength, intact sensation, and full cervical spine range of motion, Tr. 383. However, the occasionally vague—and often inconsistent—records submitted by Plaintiff fail to document all of Listing 1.04's required medical findings.

Moreover, the ALJ stated that he considered Plaintiff's impairments, both singularly and in combination, and noted that they did not meet or medically equal any of the Listings.  Plaintiff correctly observes that the ALJ's decision does not explicitly mention the back disorder and obesity impairments under the step three point heading, but this formatting aspect does not alone render the ALJ's decision invalid or unlawful.  "<u>Burnett</u> does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis. Rather, the function of <u>Burnett</u> is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review."  <u>Jones</u>, 364 F.3d at 505.

In this case, the ALJ's decision satisfies <u>Burnett</u>'s call for a reasoned decision that permits meaningful review because it frequently cites to the record while articulating why Plaintiff's physical impairments do not meet or equal a listed impairment.  In deciding that "[o]verall, the claimant's back disorder is not disabling," Tr. 25, the ALJ takes note that the described pain was "transient in nature," and that "two normal x-rays [exist] in the record, one from December 7, 2009 (Exhibit 2F p.14), and one from October 21, 2010 (Exhibit 2F p.20)."  <u>Id.</u>  The decision proceeds to describe several factors that influenced the ALJ's judgment, noting that "[d]uring the hearing, the claimant testified that no surgery had been recommended and that she never discussed taking pain medication with the doctors."  <u>Id.</u>  Furthermore, "the claimant testified that she liked to get out of her house daily and walked up to 30 minutes, including pulling a shopping cart of groceries from the supermarket."  <u>Id.</u>

The ALJ further illuminates his decision-making process by writing that "the claimant appears to be trying to show that her condition is worse than it actually is.  For example, throughout the progress notes from Trinitas, the claimant reported no suicidal ideation (Exhibit 15F pp.4-28).  However, during a consultative examination with Dr. Silikovitz, the claimant alleged having

suicidal ideation as recently as one week earlier (Exhibit 12F p.2)." Tr. 24.  Further expanding on his concerns of credibility, the ALJ noted that "the claimant brought disability forms to her psychiatrist Dr. Gorman asking him to fill then [sic] out again because her law firm had said the previous forms showed only minimal limitations (Exhibit 15F p.28).  Id.  Accordingly, the ALJ's decision is clearly reasoned and based on "such relevant evidence as a reasonable mind might accept as adequate."  Ventura, 55 F.3d at 901.

> b.  The ALJ's alleged failure to compare Plaintiff's impairments to Listing 12.04

With respect to Plaintiff's bipolar disorder and depression, she claims the ALJ failed to consider whether her mental impairments, in isolation or combination, were medically equal to Listing 12.04.  Pl.'s Br. at 15-18.  Plaintiff's contention is again misplaced.  The ALJ thoroughly developed the record, Tr. 19-26, and determined that "the severity of claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listing 12.04."  Tr. 18.  For an impairment to reach the required level of severity to satisfy a listed impairment under 12.04, Plaintiff must prove the Listing's "A" and "B" criteria, or the Listing's "C" criteria.  In this case, the ALJ determined the evidence failed to satisfy either the "B" or "C" criteria, thus extinguishing Plaintiff's claim of disability under Listing 12.04.

Plaintiff again asserts, as she did regarding the assessment of her physical impairments, that the ALJ gives "not the slightest recognition of the obligation to set forth the evidentiary basis for a decisional finding."  Pl.'s Br. at 18.  First, the burden to prove that a Listing is met falls squarely upon the Plaintiff and not the ALJ.  20 C.F.R. § 404.1512.  Second, the ALJ provides ample recitation of the relevant facts and his method of weighing and assessing those facts.  For example, the ALJ explained that the findings of Dr. Silikovitz and Dr. Perdomo regarding the claimant's emotional and psychological condition were "are given little weight as they are based

on the self-reports of the claimant, which were contrary to her reports during the same time period

to her psychiatrist." Tr. 24-25.  In addition, the decision "takes note that on February 1, 2012, Dr.

Gordon stated that he had filled out disability papers in the past for the claimant that the claimant's

attorney felt showed her to have only minimal limitations (Exhibit 15F p.28)." Tr. 25.

The ALJ's written explanations of his decision-making processes permit meaningful

review and rest upon substantial evidence.

### 2. Alleged Failure to Base the Step Four Residual Functional Capacity ("RFC") Assessment on Substantial Evidence

Plaintiff next argues that the ALJ failed to (1) sufficiently articulate the rationale for RFC

assessment, (2) properly weigh the evidence's credibility, and (3) include all of Plaintiff's credibly

established mental limitations in the hypothetical questions posed to the Vocational Expert.  The

Court disagrees.

First, as discussed above, the ALJ's decision does sufficiently articulate the rationale for

the RFC assessment.  Though the recitation of the evidence and the ALJ's treatment of that

evidence may occur on different pages of the decision, an interplay between the two nonetheless

exists.  The ALJ discussed and assessed all the treatment notes from Plaintiff's primary care

physician and psychiatrist, emergency room records, consultative examination reports, and

Plaintiff's testimony.  Tr. 19-25.  Plaintiff's arguments in this vein are therefore unpersuasive.

Second, Plaintiff contends that the ALJ should have assessed the evidence's credibility

differently.  This claim lacks merit.  "The law is clear . . . that the opinion of a treating physician

does not bind the ALJ on the issue of functional capacity."  Brown v. Astrue, 649 F.3d 193, 197

n.2 (3d Cir. 2011) (citing Adorno v. Shalala, 40 F.3d 43, 47-48 (3d Cir. 1994)).  In this case, the

ALJ noted that Dr. Silikovitz and Dr. Perdomo each based their opinion primarily on Plaintiff's

self-reports, which were contrary to her reports given during the same time period to her

psychiatrist.  Tr. 25.  Because these doctors' findings were based primarily on self-reports and not entirely consistent with the record as a whole, the ALJ appropriately discounted their credibility. 20 C.F.R. § 416.927(c)(3), (4).

Finally, the ALJ did not erroneously omit any of Plaintiff's credibly established mental limitations from the hypothetical questions posed to the Vocational Expert.  Plaintiff alleges that the ALJ's hypothetical limitation of "work that involves only following simple instructions," Tr. 64, does not adequately convey the finding that Plaintiff has "moderate difficulties" with regard to concentration, persistence or pace.  Tr. 18.  Plaintiff rests her argument primarily on Ramirez v. Barnhart, 372 F.3d 546 (3d Cir. 2004), in which the court held that a hypothetical question limiting the claimant to (among other restrictions) "simple one or two-step tasks" was not sufficient to account for the ALJ's observation that the claimant "*often* suffered from deficiencies in concentration, persistence, or pace."  Id. at 554 (emphasis in the original).  The court explained that the limitation to simple one or two-step tasks was not sufficient to account for the claimant's mental limitations, particularly for deficiencies in pace, which could restrict the claimant from jobs with production quotas.  Id.  Had the ALJ conveyed this limitation, the court reasoned, the vocational expert's answer about available work may have been different.

However, Ramirez is distinguishable from the case at issue.  In Ramirez, it was significant that the claimant "often" experienced the relevant limitations.  Id. at 555.  The court explained:

> Of course, there may be a valid explanation for [omitting a specific limitation regarding pace] from the ALJ's hypothetical. For example, the ALJ may have concluded that the deficiency in pace was so minimal or negligible that, even though Ramirez "often" suffered from this deficiency, it would not limit her ability to perform simple tasks under a production quota. The record, however, would seem to suggest otherwise.

Id.  In contrast, here the ALJ found that Plaintiff only had "moderate difficulties" in regard to concentration, persistence or pace, and the record does not disagree.  See Tr. 18-25.  As such, the hypothetical adequately reflected those findings.

Moreover, in Ramirez, unlike the present case, medical testimony explicitly identified accommodation of a severe anxiety-related pace deficiency as a significant precondition for claimant's success in maintaining a full-time job.  Specifically, the medical testimony recommended proximity between any potential employment location and the location of the claimant's children.  See Ramirez, 372 F.3d at 555.  The ALJ's hypothetical, however, did not include this limitation and instead only provided for a reasonable number of personal phone calls, which the court found rendered the hypothetical incomplete.  See id.

Following Ramirez, courts have found hypotheticals like the one used in Plaintiff's case appropriate under similar circumstances.  See McDonald v. Astrue, 293 F. App'x 941, 946 n.10 (3d Cir. 2008) (holding that a hypothetical limitation of "simple, routine tasks" was sufficient to account for moderate limitations in concentration, persistence, and pace).  Accordingly, the hypothetical in this case corresponded to the evidence, and it was relevant and sufficient.  It follows that the ALJ's step five determination was supported by substantial evidence.

### III.   CONCLUSION

For the foregoing reasons, the Court finds the Commissioner's denial of benefits to Plaintiff to be supported by substantial evidence.  The Commissioner's denial of disability benefits is therefore **AFFIRMED.**

Date: March 9, 2016                                    /s Madeline Cox Arleo
                                                        MADELINE COX ARLEO
                                                        UNITED STATES DISTRICT JUDGE